1  **FITZGERALD MONROE FLYNN PC**
   JACK FITZGERALD (SBN 257370)
2  *jfitzgerald@fmfpc.com*
   MELANIE R. MONROE (SBN 275423)
3  *mmonroe@fmfpc.com*
   TREVOR FLYNN (SBN 253362)
4  *tflynn@fmfpc.com*
5  ALLISON FERRARO (SBN 351455)
   *aferraro@fmfpc.com*
6  2341 Jefferson Street, Suite 200
7  San Diego, California 92110
   Phone: (619) 215-1741
8  ***Counsel for Plaintiffs***

9
              UNITED STATES DISTRICT COURT
10            NORTHERN DISTRICT OF CALIFORNIA
                   SAN JOSE DIVISION
11

12
| | |
|---|---|
| KIMSA NGUYEN and DAVID GARCIA, on behalf of themselves, all others similarly situated, and the general public,<br><br>Plaintiffs,<br><br>v.<br><br>ELSEVIER INC.,<br><br>Defendant. | Case No: 5:25-cv-000825-NC<br><br>CLASS ACTION<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT, 18 U.S.C. § 2710**<br><br>Judge: Hon. Nathanael M. Cousins<br><br>JURY TRIAL DEMANDED |

With Defendant's written consent pursuant to Fed. R. Civ. P. 15(a)(2), Plaintiffs KIMSA NGUYEN and DAVID GARCIA, on behalf of themselves, all others similarly situated, and the general public, by and through their undersigned counsel, hereby bring this First Amended Complaint against Defendant ELSEVIER INC. ("Elsevier"), and allege the following upon their own knowledge, or where they lack personal knowledge, upon information and belief, including the investigation of their counsel.

## INTRODUCTION

1.  Elsevier is a global provider of scientific, technical, and medical information products and services. It owns and operates Osmosis.org ("Osmosis"), a web-based platform that provides video-based learning resources and study tools for medical, nursing, and health professionals. In violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), without notifying them or obtaining their informed written consent, Elsevier shares with third-party services providers, Intercom, Meta, and possibly other third parties, its subscribers' full names, email address, and private viewing information. Plaintiffs bring this action seeking to enjoin Elsevier's unlawful behavior, and to recover compensation for themselves and others similarly aggrieved.

## JURISDICTION & VENUE

2.  The Court has original jurisdiction over this action under 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, specifically the VPPA.

3.  The Court has personal jurisdiction over Elsevier because it has purposely availed itself of the benefits and privileges of conducting business activities within California.

4.  The Court also has personal jurisdiction over Elsevier because it has directed its activities at California and consummated transactions with its residents by making Osmosis available to California consumers, inasmuch as California consumers are encouraged to, and do register for both free and paid Osmosis accounts.

5.  Venue is proper in this Northern District of California pursuant to 28 U.S.C. § 1391(b) and (c), because Elsevier resides in (*i.e.*, is subject to personal jurisdiction in) this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## DIVISIONAL ASSIGNMENT

6. This civil action arises out of acts and omissions of Elsevier that occurred in Santa Clara County. Pursuant to Civil Local Rule 3-2(c) and (d), this action is therefore correctly assigned to the San Jose Division.

## PARTIES

7. Plaintiff Kimsa Nguyen is a resident of Los Gatos, California.

8. Plaintiff David Garcia is a resident of Houston, Texas.

9. Defendant Elsevier Inc. is a Delaware corporation with its principal place of business in New York, New York.

## FACTS

**I. THROUGH OSMOSIS, ELSEVIER DELIVERS PRE-RECORDED AUDIO VISUAL MATERIALS TO SUBSCRIBERS**

10. Founded in 2015 and purchased by Elsevier in 2021, Osmosis is an educational platform designed to provide high-quality learning resources primarily for medical students, healthcare professionals, and anyone studying health-related topics. The platform seeks to make complex medical and scientific concepts easier to understand through engaging, visually-rich educational content.

11. Osmosis has an extensive library of over 2,000 pre-recorded short, animated videos that explain medical conditions, physiology, pathology, pharmacology, and other healthcare-related topics. The platform covers a broad range of topics in medicine, nursing, and allied health sciences. From basic sciences like anatomy and biochemistry to more advanced subjects like clinical diagnosis, pathology, and treatment, Osmosis offers resources for all stages of healthcare education.

12. To access Osmosis' video library—even on a free trial basis—an individual must register with Osmosis, and during the registration must provide their full name and email address.

13. By registering for Osmosis, subscribers get access to video content that is unavailable to unregistered site visitors. For example, while unregistered visitors to Osmosis have the option to start watching videos, after a few seconds, a pop-up message appears indicating that if the unregistered visitor wishes to continue watching the video, they will need to subscribe by creating a free Osmosis account.

14.   Osmosis subscribers also have the option to register for a paid (or "premium") Osmosis Prime membership plan, to gain access to additional pre-recorded video content.

## II.   ELSEVIER KNOWINGLY DISCLOSES PERSONALLY IDENTIFABLE INFORMATION TO THIRD-PARTIES

### A.   INTERCOM

15.   Intercom is a San Francisco company providing a popular, AI-based customer messaging platform that helps online businesses communicate with their users and improve customer experiences, offering tools like live chat, email marketing, and customer support automation.[1]

16.   Osmosis uses Intercom as part of its customer engagement and support strategy, including for customer support and engagement, behavior-driven messaging, feedback collection, product announcements and updates, and onboarding and user education.

17.   Through the use of Intercom's cookies and scripts installed on the Osmosis website, when free or premium subscribers watch video content on Osmosis, Elsevier discloses to Intercom, in a single transmission, *inter alia*, (a) the title of the video, (b) the subscriber's full name, and (c) the subscriber's email address.

18.   Elsevier knew that by installing Intercom's cookies on Osmosis, it would send to Intercom Osmosis subscribers' personally identifying information, including their video-watching habits. Elsevier nevertheless deliberately installed the cookies because by using Intercom, Elsevier was able to offer different and enhanced website features designed to increase the number of Osmosis subscribers, and thereby increase its profits.

19.   Indeed, Elsevier discloses (though not in compliance with the VPPA) that it collects "Contact details, such as your name, email address, postal address, phone number and social media handle," as well as "Usage data, such as the features you used . . . and pages you visited," and "share[s] your personal information with," among others "service providers, including . . . IT service providers[.]"

20.   Moreover, Intercom's cookie is configurable, and can bet set to transmit the relevant information to Intercom either (i) only when an Osmosis user uses the Intercom-powered chatbot, or (ii) always. Prior to the filing of this lawsuit, Elsevier configured the Intercom cookie to always transmit the

---

[1] *See* http://www.intercom.com/about.

1 relevant information to Intercom. Since the filing of this lawsuit, it has re-configured the cookie to transmit the information only when an Osmosis user uses the Intercom-powered chatbot.

21. The transmission of this information occurs without subscribers' informed, written consent within the meaning of 18 U.S.C. § 2710(b)(2)(B) because:

   a. Elsevier does not and has not obtained from Osmosis subscribers "informed, written consent . . . that[] is in a form distinct and separate from any form setting forth other legal or financial obligations of" the subscriber, *see* 18 U.S.C. § 2710(b)(2)(B)(i);

   b. Elsevier has not given subscribers the "election" to have their "informed, written consent" obtained either "at the time the disclosure is sought" or "in advance for a set period of time, not to exceed 2 years or until consent is withdrawn . . . whichever is sooner," *see id.* § 2710(b)(2)(B)(ii); and

   c. Elsevier has not "provided an opportunity, in a clear and conspicuous manner, for the [subscriber] to withdraw on a case-by-case basis or to withdraw from ongoing disclosures," *see id.* § 2710(b)(2)(B)(iii).

22. Elsevier had no other basis under 18 U.S.C. § 2710(b)(2) for disclosing subscribers' personally identifiable information because the disclosure was:

   a. neither to the subscribers themselves, to law enforcement pursuant to a warrant, or in a civil proceeding, *see id.* §§ 2710(2)(A), (C), (F);

   b. not limited "solely to the names and addresses of" subscribers, nor for "the exclusive use of marketing goods and services directly to the" subscribers, *see id.* § 2710(2)(D); and

   c. not made incident to debt collection activities, order fulfillment, request processing, or the transfer of ownership, *see id.* § 2710(2)(E); *see also id.* § 2710(a)(2).

**B. META**

23. Meta Platforms, Inc. ("Meta"), formerly known as Facebook, Inc., is a publicly traded Delaware corporation and technology company headquartered in Menlo Park, California.

24. Meta's Pixel (the "Pixel") is a snippet of code that Meta offers to website owners for free which is then embedded on a third-party website that tracks a user's activity in real-time as the user navigates through a website. As soon as a user takes any action on a webpage, the Pixel's code embedded in the page

re-directs the contents of the user's communication to Meta while the communication between the user and website provider is still occurring. The Pixel allows owners, and Meta, to track users' actions on their websites, and measure the effectiveness of advertising.

25. During the relevant time period, Elsevier installed onto the Osmosis website the Meta Pixel without user or subscriber consent.

26. Through being embedded on the Osmosis website, the Pixel tracks each user's activity on that website and sends that data to Meta, linking this information with users' personal identities. Using the Pixel, Meta, without user consent, intercepts each page an Osmosis user visits, what buttons they click, how long they are on a page, as well as specific information they input into the website, and what they searched. The Pixel sends each of these pieces of information to Meta in real time with users' PII. Meta stores this data on its own servers in California, in some instances, for years.

27. Through the Pixel, Meta collects information such as visited websites and user interactions with content, allowing Meta to build detailed user profiles. Over time, as the Pixel collects more data, Meta can refine and expand the user profile, enabling it to serve highly-targeted advertisements based on a user's habits and preferences, for its own profit.

28. The level of personalization is highly granular, with this data often being associated with an individual user's Facebook or Instagram account. For example, if a user is logged into their Facebook or Instagram account when they visit the Osmosis website, Meta receives third-party cookies allowing Meta to link the data collected by the Pixel to the specific Facebook or Instagram user.

29. Meta can also link PII to individual users by identifying information collected through the Pixel through what Meta calls "Advanced Matching." There are two forms of Advanced Matching: manual matching and automatic matching. Using Manual Advanced Matching, the website developer manually sends data to Meta to link users. Using Automatic Advanced Matching, the Pixel scours the data it receives for recognizable fields, including name and email address, to match users to their Facebook or Instagram accounts.

30. Meta's data collection efforts are not limited to Meta users. Instead, it collects extensive information about individuals who have never had, or no longer have, Facebook or Instagram accounts.

31. If the Pixel collects data about a non-Facebook or Instagram user, Meta still retains and uses the data collected through in its analytics and advertising services, linking those users to "shadow profiles."

32. Indeed, Meta has publicly acknowledged that it uses data from people without Meta accounts for a variety of business purposes, including product development, customer analytics reports, and security. These uses alone make it clear that non-user data is essential for Meta's enormous profit.

33. Through the use of the Meta Pixel, installed on the Osmosis website, when free or premium subscribers watch video content on Osmosis, Elsevier knowingly discloses to Meta, in a single transmission, *inter alia*, (a) the title of the video, (b) users' identifying information, (c) the times when a user started and stopped the video, and (d) the video URL. Once this information is disclosed to Meta, it is further disclosed to third parties. This transmitted information can be used by the ordinary person to identify the individuals.

34. Elsevier knew that by installing the Meta Pixel on Osmosis, it would send to Meta Osmosis subscribers' personally identifying information, including their video-watching habits. Elsevier nevertheless deliberately installed the Pixel because by using it, Osmosis can measure ad effectiveness, optimize campaigns, and build targeted audiences for future advertising and other marketing purposes that Elsevier would otherwise have to pay for.

35. Indeed, Elsevier discloses (though not in compliance with the VPPA) that it collects "Contact details, such as your name, email address, postal address, phone number and social media handle," as well as "Usage data, such as the features you used . . . and pages you visited," and "share[s] your personal information with," among others "service providers, including . . . IT service providers[.]"

36. The transmission of this information occurs without subscribers' informed, written consent within the meaning of 18 U.S.C. § 2710(b)(2)(B) because:

    a. Elsevier does not and has not obtained from Osmosis subscribers "informed, written consent . . . that[] is in a form distinct and separate from any form setting forth other legal or financial obligations of" the subscriber, *see* 18 U.S.C. § 2710(b)(2)(B)(i);

    b. Elsevier has not given subscribers the "election" to have their "informed, written consent" obtained either "at the time the disclosure is sought" or "in advance for a set period of time, not to exceed 2 years or until consent is withdrawn . . . whichever is sooner," *see id.* § 2710(b)(2)(B)(ii); and

      c.    Elsevier has not "provided an opportunity, in a clear and conspicuous manner, for the [subscriber] to withdraw on a case-by-case basis or to withdraw from ongoing disclosures," *see id.* § 2710(b)(2)(B)(iii).

37.    Elsevier had no other basis under 18 U.S.C. § 2710(b)(2) for disclosing subscribers' personally identifiable information because the disclosure was:

      a.    neither to the subscribers themselves, to law enforcement pursuant to a warrant, or in a civil proceeding, *see id.* §§ 2710(2)(A), (C), (F);

      b.    not limited "solely to the names and addresses of" subscribers, nor for "the exclusive use of marketing goods and services directly to the" subscribers, *see id.* § 2710(2)(D); and

      c.    not made incident to debt collection activities, order fulfillment, request processing, or the transfer of ownership, *see id.* § 2710(2)(E); *see also id.* § 2710(a)(2).

## III. PLAINTIFFS' EXPERIENCE

38.    Plaintiff Kimsa Nguyen registered for Osmosis in October 2022, providing her full name and email address to Elsevier. At various times thereafter, Ms. Nguyen viewed videos on Osmosis. During at least some of these times, Ms. Nguyen was logged into her Meta account on the same browser she used to access Osmosis. As alleged herein, each time Ms. Nguyen viewed a video, Elsevier disclosed to Intercom, Meta and potentially other third parties, in the same transmission her personally identifiable information, including at least her full name, email address, and the title of the video she viewed.

39.    Plaintiff David Garcia registered for Osmosis in July 2023, providing his full name and email address to Elsevier. At various times thereafter, Mr. Garcia viewed videos on Osmosis. As alleged herein, each time Mr. Garcia viewed a video, Elsevier disclosed to Intercom and potentially other third parties, in the same transmission his personally identifiable information, including at least his full name, email address, and the title of the video he watched.

40.    Elsevier never gave Plaintiffs, in a form distinct and separate from any other form setting forth other legal or financial obligations (such as Elsevier's Terms of Service and Privacy Policy), notice of its disclosure of their personally identifiable information to Intercom.

41.    Plaintiffs never gave Elsevier their informed, written consent to the disclosure of their personally identifiable information to Intercom, Meta, or any other third parties.

## CLASS ACTION ALLEGATIONS

42. While reserving the right to redefine or amend the class definition prior to or as part of a motion seeking class certification, pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seek to represent a Class of all persons in the United States who, at any time during the two years preceding the date of the filing of this Complaint to the time a class is notified (the "Class Period"), registered with Osmosis and watched at least one video on Osmosis.

43. The Members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the Class in a single action will provide substantial benefits to the parties and Court. Osmosis has represented that it has over 6 million subscribers worldwide, which would mean approximately 2.2 million subscribers in the U.S. if proportional to the global population.

44. Questions of law and fact common to Plaintiffs and the Class include but are not limited to:

   a. Whether Elsevier is a "video tape service provider" within the meaning of 18 U.S.C. § 2702(a)(4);

   b. Whether Plaintiffs and other Class Members are "consumers" within the meaning of 18 U.S.C. § 2702(a)(1);

   c. Whether Elsevier knowingly disclosed to Intercom, Meta, or other third parties Plaintiffs' and other Class Members' "personally identifiable information" within the meaning of 18 U.S.C. §§ 2702(a)(3) and 2702(b)(1);

   d. Whether Elsevier was authorized by 18 U.S.C. § 2702(b)(2) to disclose to any person Plaintiffs' and other Class Members' personally identifiable information;

   e. The amount of damages, punitive damages, and attorneys' fees the Court should award; and

   f. What injunctive, equitable, or other relief the Court should award.

45. These common questions of law and fact predominate over questions that affect only individual members of the Class.

46. Plaintiffs' claims are typical of the Class's claims because they are based on the same underlying facts, events, and circumstances relating to Elsevier's conduct. Specifically, all Class Members,

1 including Plaintiffs, were subjected to the same violation of privacy as a result of Elsevier's knowing disclosure of their personally identifiable information.

47. Plaintiffs will fairly and adequately represent and protect the interests of the Class, have no interests incompatible with the interests of the Class, and have retained counsel competent and experienced in class action litigation who will vigorously prosecute this action and will otherwise protect and fairly and adequately represent Plaintiffs and the Class.

48. Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small, such that, absent representative litigation, it would be infeasible for each Class Member to redress the wrongs done to them.

49. Elsevier has acted on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

50. As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

## CAUSE OF ACTION

### Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710

51. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

52. Defendant Elsevier is a video tape service provider pursuant to 18 U.S.C. § 2710(a)(4) because, by virtue of owning and operating Osmosis, it is engaged in interstate commerce, in the business of the rental, sale, or delivery of prerecorded audio visual materials, namely its video library of more than 2,000 health- and medical-related videos.

53. Plaintiffs and other Class Members are renters, purchasers, or subscribers of services from Elsevier, and thus consumers within the meaning of 18 U.S.C. § 2710(a)(1).

54. Elsevier knowingly disclosed to Intercom, Meta, and potentially other third parties, personally identifiable information concerning Plaintiffs and other Class Members, including their video content, full names, and email addresses.

55. This information would readily permit an ordinary person to identify a specific individual's video-watching behavior.

56. Elsevier's disclosure was not subject to any of the exceptions set forth in 18 U.S.C. § 2710(b)(2).

57. As a result, Plaintiffs and each Class Member is entitled to actual damages, but not less than liquidated damages in an amount of $2,500; punitive damages; reasonable attorney's fees and other litigation costs; and equitable relief as the Court determines to be appropriate. *See* 18 U.S.C. § 2710(c)(2).

## **PRAYER FOR RELIEF**

58. Wherefore, Plaintiffs, individually and on behalf of the proposed Class, pray for judgment as follows:

    a. An Order declaring this action to be a proper class action, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' undersigned counsel as Class Counsel;

    b. An Order requiring Elsevier to bear the cost of Class Notice;

    c. An Order requiring Elsevier to pay statutory, compensatory, and punitive damages as permitted by law;

    d. An Order enjoining Elsevier from disclosing the personally identifiable information of Osmosis' subscribers without their informed, written consent obtained in a manner consistent with 18 U.S.C. § 2710(b)(2)(B);

    e. An Order compelling Elsevier, Intercom, Meta, and any other third parties to whom Plaintiffs' and Class Members' whom it was sent, to destroy all personally identifiable information and to comply with 18 U.S.C. § 2702(e);

    f. A judgment awarding any and all further equitable, injunctive, and declaratory relief as may be appropriate;

    g. Pre- and post-judgment interest, as permitted by law;

    h. An award of attorney fees and costs; and

    i. Such further relief as the Court deems necessary, just, or proper.

///

///

///

///

## JURY DEMAND

59. Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: August 26, 2025

/s/ Jack Fitzgerald
**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD
*jfitzgerald@fmfpc.com*
MELANIE R. MONROE
*mmonroe@fmfpc.com*
TREVOR FLYNN
*tflynn@fmfpc.com*
ALLISON FERRARO
*aferraro@fmfpc.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741

***Counsel for Plaintiffs***