**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD (SBN 257370)
*jfitzgerald@fmfpc.com*
MELANIE R. MONROE (SBN 275423)
*mmonroe@fmfpc.com*
TREVOR M. FLYNN (SBN 253362)
*tflynn@fmfpc.com*
KADEN D. BYRON (SBN 333158)
*kbyron@fmfpc.com*
ALLISON FERRARO (SBN 351455)
*aferraro@fmfpc.com*
DANIEL E. SACHS (SBN 361027)
*dsachs@fmfpc.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
***Counsel for Plaintiffs***

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

KIMSA NGUYEN and DAVID GARCIA, on behalf of themselves, all others similarly situated, and the general public,

Plaintiffs,

v.

ELSEVIER, INC.,

Defendant.

Case No. 5:25-cv-00825-NC

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**REDACTED FOR PUBLIC FILING**

Judge: Hon. Nathanael M. Cousins
Date: December 9, 2026
Time: 11:00 a.m.
Location: Courtroom 5, 4th Floor

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES ........ iii

NOTICE OF MOTION ........ 1

ISSUE TO BE DECIDED ........ 1

MEMORANDUM ........ 1

I. INTRODUCTION ........ 1

II. THE PROPOSED CLASS & OBJECTIVE IDENTIFICATION METHOD ........ 2

III. COMMON EVIDENCE ........ 4

A. Osmosis is Elsevier's On-Demand Subscription Video Service ........ 4

B. Elsevier Used Common Tracking Architecture on Osmosis ........ 5

C. Third-Party Records Confirm Elsevier's Actual Disclosures ........ 7

D. Elsevier Relies on Common Consent Materials ........ 9

IV. LEGAL STANDARD ........ 10

V. ARGUMENT ........ 10

A. THE REQUIREMENTS OF RULE 23(a) ARE SATISFIED ........ 10

1. Numerosity ........ 10

2. Commonality ........ 12

3. Typicality ........ 12

4. Adequacy ........ 13

B. THE REQUIREMENTS OF RULE 23(b)(3) ARE SATISFIED ........ 14

1. Common Questions Predominate ........ 14

a. Consumer Status is Common ........ 14

b. Elsevier is a "Video Tape Service Provider" ........ 15

c. Qualifying Records Contain Personally Identifiable Information ........ 16

d. Knowledge is Shown Through Common Corporate Evidence ........ 17

e. Consent is a Common Statutory Defense ........................................ 21

f. Ordinary Course of Business is a Common Statutory Defense ........................................ 22

g. The Records-Defined Class Avoids Individualized Standing and Transmission Issues ........................................ 23

h. Statutory Damages are Capable of Classwide Measurement ........................................ 23

2. A Class Action is Superior and Manageable ........................................ 24

3. The Court Should Certify the Third-Party Recipient Subclasses ........................................ 25

VI. CONCLUSION ........................................ 25

## TABLE OF AUTHORITIES

**Cases**

*Balestrieri v. SportsEdTV, Inc.*,
2025 WL 2776356 (N.D. Cal. Sept. 16, 2025) .......... 17

*Ballard v. Insomniac Holdings, LLC*,
2025 WL 1696558 (N.D. Cal. June 17, 2025) .......... 15

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) .......... 9

*Carbone v. Ltd. Run Games, Inc.*,
2025 WL 3254618 (E.D.N.Y. Nov. 21, 2025) .......... 12, 13, 14, 24

*Civil Rights Educ. & Enforcement Ctr. v. Hosp. Props. Tr.*,
867 F.3d 1093 (9th Cir. 2017) .......... 10

*Cole v. LinkedIn Corp.*,
807 F. Supp. 3d 959 (N.D. Cal. 2025) .......... 17

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .......... 10, 23

*Davis v. Lab. Corp. of Am. Holdings*,
2022 WL 22855520 (C.D. Cal. June 13, 2022) .......... 24

*Edwards v. MUBI, Inc.*,
773 F. Supp. 3d 868 (N.D. Cal. 2025) .......... 17

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) .......... 16

*Ellis v. Cartoon Network Inc.*,
803 F.3d 1251 (11th Cir. 2015) .......... 14

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) .......... 14

*Fitzhenry-Russell v. Dr Pepper Snapple Grp., Inc.*,
326 F.R.D. 592 (N.D. Cal. 2018) .......... 10, 24

*Gershzon v. Colgate-Palmolive Co.*,
2026 WL 1916431 (N.D. Cal. Apr. 13, 2026) .......... 24

*Ghanaat v. Numerade Labs, Inc.*,
689 F. Supp. 3d 714 (N.D. Cal. 2023) .......... 14

*Golden v. NBCUniversal Media, LLC*,
688 F. Supp. 3d 150 (S.D.N.Y. 2023) .......... 17

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) .......... 12, 13, 14, 24

*Healy v. Milliman, Inc.*,
164 F.4th 701 (9th Cir. 2026) .......... 8, 23

*In re Hulu Privacy Litig.*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015) .......... 17

*J.L. v. Cissna*,
2019 WL 415579 (N.D. Cal. Feb. 1, 2019) .......... 10

*Jancik v. WebMD LLC*,
2025 WL 560705 (N.D. Ga. Feb. 20, 2025) .......... passim

*Kueppers v. Zumba Fitness, LLC*,
2026 WL 2436413 (S.D. Fla. Aug. 20, 2026) .......... passim

*Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*,
244 F.3d 1152 (9th Cir. 2001) .......... 24

*Mason v. Spring EQ, LLC*,
2025 WL 2962567 (C.D. Cal. Sept. 25, 2025) .......... 24

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012) .......... 12

*Mollett v. Netflix, Inc.*,
795 F.3d 1062 (9th Cir. 2015) .......... 17

*Nguyen v. Elsevier Inc.*,
2025 WL 1635679 (N.D. Cal. June 9, 2025) .......... 8, 15, 17

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F4th 651 (9th Cir. 2022) .......... 10, 14

*Osheske v. Silver Cinemas Acquisition Co.*,
132 F.4th 1110 (9th Cir. 2025) .......... 16

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003) .......... 13

*Sutton v. TED Found.*,
2026 WL 207000 (S.D.N.Y. Jan. 27, 2026) .......... 23

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......... 10, 12

*Wolin v. Jaguar Land Rover N. Am., LLC*,
617 F.3d 1168 (9th Cir. 2010) .......... 24

**Rules**

Fed. R. Civ. P. 23(a)(1) .......... 10

Fed. R. Civ. P. 23(a)(2) .......... 12

Fed. R. Civ. P. 23(a)(3) .......... 12

Fed. R. Civ. P. 23(a)(4) .......... 13

Fed. R. Civ. P. 23(b)(3)(A) .......... 24

Fed. R. Civ. P. 23(b)(3)(B) .......... 24

Fed. R. Civ. P. 23(b)(3)(C) .......... 24

Fed. R. Civ. P. 23(b)(3)(D) .......... 24

**Statutes**

18 U.S.C. § 2710(a)(1) .......... 14

18 U.S.C. § 2710(a)(3) .......... 14

18 U.S.C. § 2710(a)(4) .......... 14, 15

18 U.S.C. § 2710(b)(1) .......... 14, 17

18 U.S.C. § 2710(b)(2) .......... 9, 14

18 U.S.C. § 2710(b)(2)(B) .......... 12, 22

18 U.S.C. § 2710(b)(2)(E) .......... 12

18 U.S.C. § 2710(c)(2) .......... 23

## NOTICE OF MOTION

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD: PLEASE TAKE NOTICE, that on December 9, 2026, at 11:00 a.m., Plaintiffs Kimsa Nguyen and David Garcia will move the Court, the Honorable Nathanael M. Cousins presiding, for class certification pursuant to Fed. R. Civ. P. 23. This Motion is based on this Notice of Motion; the below Memorandum; the concurrently-filed Declarations of Jack Fitzgerald ("Fitzgerald Decl."), Kimsa Nguyen ("Nguyen Decl."), David Garcia ("Garcia Decl."), and Dr. Stuart Schechter ("Schechter Decl.") and all exhibits thereto; the Expert Reports of Jason Frankovitz ("Frankovitz Report"), Dr. Stuart Schechter ("Schechter Report"), and Andrew Shaxted ("Shaxted Report") and all exhibits thereto; all prior pleadings and proceedings in the action; and all further argument and evidence presented in support of the Motion.

Plaintiffs request that the Court certify the Class, including the Subclasses defined herein, appoint Plaintiffs Class Representatives, and appoint their counsel Class Counsel.

## ISSUE TO BE DECIDED

Whether a records-defined Class of registered Osmosis users satisfies Rule 23 where membership and injury turn on electronic records that associate an identifiable user with specific Osmosis video materials or services, and where the principal liability questions turn on Elsevier's common platform, code, tracker configurations, corporate decisions, and consent materials.

## MEMORANDUM

### I. INTRODUCTION

This case concerns uniform practices and involves objective inquiries. Elsevier required Osmosis users to register by providing their names and email addresses to obtain full access to the platform's substantial library of prerecorded medical-education videos. It then configured Osmosis to transmit page-view and other relevant data to multiple outside companies. The page title and URLs of the relevant "Learn pages" on Osmosis—those that begin www.osmosis.org/learn and host Osmosis's pre-recorded videos—identify the video materials or services that users requested or obtained. And third-party recipient records of Plaintiffs' Osmosis use show tracking on Osmosis was not merely hypothetical, since they associate an identifiable person with the specific Osmosis video materials and services appearing on the relevant Learn page each person accessed.

The proposed Class is therefore limited to people for whom qualifying third-party recipient records exist, just as it was in two recently certified VPPA class actions. *See Kueppers v. Zumba Fitness, LLC*, 2026 WL 2436413, at *2 (S.D. Fla. Aug. 20, 2026); *Jancik v. WebMD LLC*, 2025 WL 560705, at *2 (N.D. Ga. Feb. 20, 2025). This means membership does not require any Osmosis user to remember watching a video, submit an affidavit, or prove they used a browser on which transmission was possible. Rather, someone is a Class Member only if Intercom, Meta, Pinterest, or Pendo records associate an identifier objectively linked to them with the URL or title of an Osmosis Learn page identifying specific video materials or services they accessed. That definition obviates any need to analyze browser settings, network conditions, or blocked transmissions. If no qualifying record exists, the person is not in the Class.

Liability will then be resolved through common proof. Whether Osmosis delivers prerecorded audiovisual materials, whether registered users are consumers, whether an identified Learn-page URL or page title identifies specific video materials or services, whether Elsevier knowingly configured the transmissions, and whether Elsevier's generalized privacy materials satisfy the VPPA's exacting consent requirements do not vary from person to person. Plaintiffs' evidence—including Elsevier's records, source code and Google Tag Manager configurations, deposition testimony, written discovery, and Intercom, Meta, Pinterest, and Pendo productions—supplies common answers. The Court should thus certify the Class and the four recipient Subclasses discussed below.

## II. THE PROPOSED CLASS & OBJECTIVE IDENTIFICATION METHOD

Plaintiffs seek certification of a Class of:

> All persons who resided in the United States when the qualifying event occurred, who, between January 24, 2023 and the date of the order granting class certification (the "Class Period"), were registered Osmosis users and for whom Intercom, Meta, Pinterest, or Pendo records associate (1) the person's name, email address, Osmosis user ID, recipient-account identifier, or another identifier objectively linked through existing electronic records to the person or their Osmosis account with (2) *either* (a) the URL or page title of an Osmosis Learn page hosting a specific video *or* (b) a video-player event identifying a specific Osmosis video by its title, concept, or Media ID.

Plaintiffs propose dividing the Class Members into four recipient-based Subclasses under Rule 23(c)(5):

> **Intercom Subclass:** All Class Members for whom Intercom event records during the Class Period contain, for the same event: (1) the person's name, email address, Osmosis user ID, or the Intercom user identifier associated with the person's Osmosis account; and (2) the URL or page title of an Osmosis Learn page hosting a video.

**Meta Subclass:** All Class Members for whom Meta event records during the Class Period contain, for the same event: (1) a Facebook Pixel Cookie or email address (whether or not hashed) associated with the person's Osmosis account; and (2) the URL of a specific Osmosis Learn page hosting a video.

**Pinterest Subclass:** All Class Members for whom Pinterest event records during the Class Period contain, for the same event: (1) the person's Pinterest User ID; and (2) the URL of a specific Osmosis Learn page hosting a video.

**Pendo Subclass:** All Class Members for whom Pendo event records during the Class Period contain, for the same event: (1) the person's name, email address, or Osmosis user ID (referred to as "visitor ID" in Pendo records); and (2) *either* (a) the URL or page title of a specific Osmosis Learn page hosting a video, or (b) a video-player event identifying a specific video by its title, concept, or media ID.

Plaintiff Kimsa Nguyen seeks appointment as Class Representative of the Intercom, Pinterest, and Pendo Subclasses while Plaintiff David Garcia seeks appointment as Class Representative of the Meta, Pinterest, and Pendo Subclasses.

A person needs only one qualifying record to be a Class Member. Duplicate records and multiple recipient records affect neither membership nor the existence of a common VPPA claim. And the identification process is mechanical. Elsevier maintains registration records containing users' names, email addresses, join dates, unique Osmosis user IDs, and for many, country information. Ex. 39,[1] 30(b)(6) Dep. Tr. 68:10-69:10, 70:1-15; Fitzgerald Decl. ¶¶ 2-4 & Exs. 1-2 (Plaintiff registration records); Frankovitz Report ¶¶ 61-65, 72-77. Elsevier also maintains video-views and video-watch records connecting Osmosis user IDs to specific videos and sessions. Ex. 39, 30(b)(6) Dep. Tr. 111:17-113:2, 116:3-14, 119:10-16; Fitzgerald Decl. ¶¶ 5-68 & Exs. 3-4; Frankovitz Report ¶¶ 62, 66-69, 79 & n.56; Shaxted Report ¶¶ 24(b)(ii), 56-60. Recipient records will supply the corresponding third-party transmission and can be joined using the same identifier-matching methods that both sides' experts applied to Plaintiffs. *See* Ex. 39, 30(b)(6) Dep. Tr. 99:15-101:16, 297:5-22, 303:9-16, 304:2-305:2, 307:18-20, 308:5-16, 310:2-22; Ex. 37, Nxusani Dep. Tr. 60:11-24, 63:15-22, 101:5-12, 146:14-147:1; Frankovitz Report ¶¶ 83-93; Schechter Report ¶¶ 84-87, 125-29; Shaxted Report ¶¶ 89, 96-97; Schechter Decl. ¶¶ 9-24.

In sum, this is a records-defined Class whose members can be identified from existing data fields, as confirmed by Elsevier's testimony and the analysis of its own expert. On behalf of Elsevier, Andrew Shaxted

[1] Plain "Ex." references are to the Fitzgerald Declaration.

matched Elsevier and Intercom records for Ms. Nguyen, and Elsevier and Meta records for Mr. Garcia, associated recipient rows with each Plaintiff, extracted URLs and titles, and compared those data with Elsevier's records. Shaxted Report ¶¶ 89, 96-97. His disagreement with Plaintiffs concerns how broadly to interpret those records, not whether matching can be performed objectively.

## III. COMMON EVIDENCE

### A. Osmosis is Elsevier's On-Demand Subscription Video Service

Elsevier owns and operates Osmosis, a medical-education platform whose prerecorded animated videos explain medical conditions and various health topics. Dkt. No. 38, First Am. Compl. ("FAC") ¶¶ 10-12; Ex. 39, 30(b)(6) Dep. Tr. 22:24-23:9, 30:16-31:1, 32:1-13, 143:11-19; Ex. 36, Feldstein Dep. Tr. 15:11-19; Frankovitz Report ¶¶ 21-23; Schechter Report ¶¶ 1, 15-17. Osmosis's Director of Product Management, Adam Feldstein, testified Elsevier "offer[s] video access as part of [its] subscription," and that "Osmosis creates whiteboard-style videos that are a big part of the service," Ex. 36, Feldstein Dep. Tr. 15:15-19, 119:20-120:7; *see also* Ex. 17 (Response to Request for Admission No. 7 (admitting "Osmosis hosts pre-recorded video content that subscribers can view"); Ex. 40, Nguyen Dep. Tr. 37:5-15 (describing Osmosis as "a video platform that creates educational materials for medical students," and testifying video was "the main thing I used it for"); Ex. 41, Garcia Dep. Tr. 55:16-22 (based "upon what [he] know[s] of other medical students," testifying they "interacted with" "primarily the videos"); *see also id.* 130:8-13 (testifying he "liked Osmosis over the textbooks" because "Videos just tend to work better for me").

Video materials on Osmosis can be identified or linked through, *inter alia*, URL, page title, concept, and unique Media ID. Ex. 39, 30(b)(6) Dep Tr. 38:1-11, 47:9-23, 51:13-52:5, 73:10-74:8, 90:23-91:12, 120:16-23, 124:16-125:1, 116:7-14. Elsevier calls the Osmosis pages that host video materials "Learn pages." Ex. 36, Feldstein Dep. Tr. 104:16-105:1. Learn-page URLs contain the human-readable topic or title of the video materials on that page. Ex. 39, 30(b)(6) Dep Tr. 38:1-11, 47:15-23, 51:13-52:5; Ex. 43, Shaxted Dep Tr. 102:17-24, 104:10-105:2, 113:15-114:12; Ex. 42, Frankovitz Dep. Tr. 16:19-18:9, 19:5-13; Ex. 44, Schechter Dep. Tr. 113:1-19, 114:15-18, 119:3-11; Frankovitz Report ¶ 23; Schechter Report ¶¶ 16-17. Thus, for example, "https://www.osmosis.org/learn/glycolysis" identifies the Glycolysis video materials or services available on that page.

For search engine optimization, video-bearing Learn pages generally have corresponding, no-frills /video/ pages, such as "https://www.osmosis.org/video/glycolysis" for the Glycolysis video. Ex. 39, 30(b)(6) Dep. Tr. 34:20-35:20, 48:16-50:10, 66:3-14, 67:20-24; Ex. 44, Schechter Dep. Tr. 100:13-102:4, 113:18-114:3, 115:1-11, 132:10-133:24. Learn pages that do not host videos can be identified and mechanically excluded from the Class. *See* Ex. 39, 30(b)(6) Dep. Tr. 32:20-33:19; Ex. 44, Schechter Dep. Tr. 113:18-24, 114:1-3, 115:1-11, 131:9-134:3. The same applies to URLs in third-party records that resolve to Osmosis search results rather than Learn pages. *Compare* Ex. 43, Shaxted Dep. Tr. 29:14-30:8, 102:17-103:7, 104:10-24, *with* Schechter Decl. ¶¶ 4-7.

Access to Osmosis's full video library requires registration. Ex. 39, 30(b)(6) Dep Tr. 27:9-20; Ex. 36, Feldstein Dep. Tr. 27:22-28:2, 30:20-31:7. To register, a user must supply their name and email address and create an account. Ex. 39, 30(b)(6) Dep Tr. 27:21-28:8, 30:1-10; Ex. 36, Feldstein Dep. Tr. 95:12-96:6. Users may purchase access directly, take a full-access trial, or obtain access through an institution that contracts with Osmosis. Ex. 39, 30(b)(6) Dep. Tr. 27:16-20, 31:2-25; Ex. 36, Feldstein Dep. Tr. 29:18-32:5, 42:9-21. In every relevant channel, the user establishes an ongoing registered relationship with Osmosis and obtains restricted video access.

Elsevier tracks registered Osmosis users' viewing, including recording identifiers for the user and video or Learn page and the user's video progress, so that they may return and resume where they stopped. Ex. 39, 30(b)(6) Dep Tr. 59:20-60:19, 61:17-62:13, 115:1-6, 116:7-14; Ex. 35, Leddy Dep. Tr. 105:4-106:7. Thus, users have individualized, on-demand control over the Osmosis platform's prerecorded video materials.

### B. Elsevier Used Common Tracking Architecture on Osmosis

Elsevier implemented tracking practices through common source code, Google Tag Manager containers, tags (*i.e.*, trackers), triggers, and other tracker configurations applied to similarly-situated Osmosis users. Ex. 39, 30(b)(6) Dep Tr. 173:6-175:21, 288:4-289:2; Ex. 37, Nxusani Dep. Tr. 60:11-24, 101:5-12, 127:3-19, 149:12-151:2; Ex. 43, Shaxted Dep. Tr. 220:17-221:12, 222:20-223:9; Ex. 44, Schechter Dep. Tr. 74:6-16, 172:24-173:7, 207:24-208:12. Among other tracking mechanisms, Plaintiffs' expert, Dr. Stuart Schechter, identified source code files that installed or supported Meta, Intercom, Pendo, Google Tag Manager ("GTM"), and internal tracking. Schechter Report ¶¶ 75-79. Elsevier also used multiple GTM

containers to deploy tags and to configure when they fired and what information they sent. *Id.* ¶¶ 41-63; *see also* Frankovitz Report ¶¶ 28-43; Ex. 39, 30(b)(6) Dep. Tr. 164:13-165:22, 167:10-168:22, 171:19-172:5, 173:6-174:7, 207:9-16, 208:15-20, 243:9-244:7.

The relevant tracker configurations are concrete. Intercom was implemented through Osmosis code that took [redacted]. Ex. 37, Nxusani Dep. Tr. 101:1-12; *see also* Ex. 43, Shaxted Dep. Tr. 197:6-199:6; Schechter Report ¶¶ 80-87; Frankovitz Report ¶¶ 83-89; Fitzgerald Decl. ¶¶ 27-30 & Exs. 24-26. Intercom also received contextual information concerning Ms. Nguyen's Osmosis activity, including [redacted]. Ex. 39, 30(b)(6) Dep. Tr. 94:5-14; Ex. 43, Shaxted Dep. Tr. 198:15-199:6; Schechter Report ¶¶ 86-87.

The Meta (or Facebook) Pixel was installed [redacted], and it transmitted [redacted]. Ex. 39, 30(b)(6) Dep. Tr. 97:6-98:14, 206:10-207:16, 301:18-304:6; Schechter Report ¶¶ 76, 112-29; Frankovitz Report ¶¶ 36, 56-57.

Osmosis's implementation of the Pinterest Tag, which it called [redacted] used an [redacted] trigger and transmitted [redacted] *See* Ex. 39, 30(b)(6) Dep. Tr. 238:13-241:20, 243:3-22, 307:5-24, 308:5-16; Ex. 37, Nxusani Dep. Tr. 189:18-190:3, 191:2-16; Ex. 44, Schechter Dep. Tr. 94:6-13, 207:21-208:5; Schechter Report ¶¶ 130-32; Frankovitz Report ¶¶ 33, 36; Exs. 29-32.

Finally, Osmosis's Pendo integration was installed [redacted]. Ex. 39, 30(b)(6) Dep. Tr. 248:12-249:16, 255:4-256:13, 257:2-258:11, 310:2-22; Ex. 37, Nxusani Dep. Tr. 124:16-125:20, 147:15-151:2; Ex. 44, Schechter Dep. Tr. 79:1-10, 80:11-14, 203:23-204:6; Schechter Report ¶¶ 76-79; Schechter Decl. ¶¶ 16-24; Exs. 33-34.

While some configurations changed over time, the changes are themselves common evidence reflected in versioned code, GTM exports, and tag histories. They do not require testimony from individual users. For each configuration period, the factfinder can determine from common technical and recipient records what code ran, what tags were deployed, what triggers were configured, what data were available for

transmission, and what recipients actually received. *See* Ex. 39, 30(b)(6) Dep. Tr. 173:2-175:18, 200:19-201:12, 278:20-24, 288:4-289:2; Ex. 44, Schechter Dep. Tr. 168:21-170:10, 172:24-173:7, 199:4-13.

### C. Third-Party Records Confirm Elsevier's Actual Disclosures

Ms. Nguyen's Intercom records contain her identity information together with her Osmosis activity. Fitzgerald Decl. ¶¶ 26-30 & Exs. 24-26. Plaintiffs' experts identified Ms. Nguyen's [redacted] in those records. Frankovitz Report ¶¶ 83-89; Schechter Report ¶¶ 85-87; *see also* Ex. 39, 30(b)(6) Dep. Tr. 291:8-15, 292:24-293:16, 297:5-22 (admitting Intercom received Ms. Nguyen's information). Her activity was also present in Pinterest's records. Ex. 39, 30(b)(6) Dep. Tr. 305:16-306:14, 308:5-16, 309:6-310:15; Ex. 44, Schechter Dep. Tr. 237:5-238:7; Schechter Decl. ¶¶ 12-14. And Elsevier's own records independently show Ms. Nguyen's registration, subscription, and video activity. Fitzgerald Decl. ¶¶ 2, 5-8 & Exs. 1, 3-4, 20-21; *see also* Ex. 39, 30(b)(6) Dep. Tr. 68:10-69:10, 71:8-19, 72:11-16, 111:17-112:19, 115:24-116:14; Ex. 43, Shaxted Dep. Tr. 122:17-123:3.

Mr. Garcia's Meta records likewise associate [redacted]. Fitzgerald Decl. ¶¶ 32-33 & Exs. 27-28; *see also* Ex. 39, 30(b)(6) Dep. Tr. 301:4-302:7, 302:20-304:6; Ex. 43, Shaxted Dep. Tr. 133:18-137:11. Meta produced hundreds of Osmosis event rows corresponding to Mr. Garcia. Frankovitz Report ¶¶ 90-93; Schechter Report ¶¶ 125-29; Shaxted Report ¶ 89. A September 10, 2023 record, for example, identifies [redacted]. Ex. 27 (row 29); Frankovitz Report ¶¶ 90-93; Schechter Report ¶¶ 125-29; Shaxted Report ¶ 89. Pinterest also produced event data for Mr. Garcia and [redacted]. Fitzgerald Decl. ¶¶ 36-38 & Exs. 29-32; Schechter Decl. ¶¶ 12-13, 15; *see also* Ex. 39, 30(b)(6) Dep. Tr. 305:16-308:9. Those records show Pinterest associated specific Osmosis Learn-page visits with a specific Pinterest account. *See* Ex. 39, 30(b)(6) Dep. Tr. at 306:2-308:16. Like with Ms. Nguyen, Elsevier's video records independently confirm Mr. Garcia's Osmosis account and viewing history. Fitzgerald Decl. ¶¶ 4-8 & Exs. 2-4. For example, [redacted]. *Id.* ¶ 32.

Pendo's production likewise confirms actual disclosures for both Plaintiffs, identifying Ms. Nguyen as [redacted] and Mr. Garcia as [redacted], the same unique IDs Elsevier assigned to their Osmosis accounts. Ex. 39, 30(b)(6) Dep. Tr. 256:3-13; Ex. 37, Nxusani Dep. Tr. 160:15-161:20, 164:13-166:10; Ex. 42, Frankovitz Dep. Tr. 44:13-45:4, 47:19-23; Schechter Decl. ¶¶ 16-24. Pendo's documents also include [redacted] records containing identifying and account information including [redacted]. *See* Fitzgerald Decl. ¶¶ 41-42 & Exs. 33-34 (Pendo Productions); Ex. 39, 30(b)(6) Dep. Tr. 256:3-18, 258:3-11; Ex. 37, Nxusani Dep. Tr. 161:6-162:7, 164:10-166:5; Ex. 44, Schechter Dep. Tr. 237:5-22. The same visitor IDs appear in [redacted] *See*, *e.g.*, Ex. 33 at 5; Ex. 34 at 199; *see also* Ex. 39, 30(b)(6) Dep. Tr. 256:3-7, 258:3-11; Ex. 37, Nxusani Dep. Tr. 154:19-22, 161:6-162:7, 162:20-163:1, 163:17-23; Ex. 44, Schechter Dep. Tr. 39:6-40:8, 186:7-11, 230:24-231:7. For example, Pendo recorded Ms. Nguyen's completion of [redacted] and Mr. Garcia's completion of [redacted] each tied to their persistent visitor ID. *See* Ex. 33 at 5; Ex. 34 at 199. Pendo's own records thus objectively link Plaintiffs' identities to the specific Osmosis videos they requested or obtained—and, indeed, thereafter watched. *Cf. Nguyen v. Elsevier, Inc.*, 2025 WL 1635679, at *4 (N.D. Cal. June 9, 2025) (Cousins, J.) ("Plaintiffs have no need to demonstrate whether the disclosure reveals a user has watched the requested or obtained video to satisfy the third element of an actionable VPPA claim." (citation omitted)).

These productions also answer any standing concern. At certification, Article III is satisfied if at least one named plaintiff has standing. *Healy v. Milliman, Inc.*, 164 F.4th 701, 706-708 (9th Cir. 2026). Following certification, unnamed damages-class members may produce direct or circumstantial evidence of standing at summary judgment under ordinary summary-judgment standards. *Id.* at 708-710. The Class definition here anticipates satisfying that requirement by including only persons for whom third-party recipient records connect them in the same event with a specific Osmosis video URL or title.

Recipient possession is, of course, powerful evidence of actual disclosure and moots any inquiry into individual browser settings. *See* Ex. 43, Shaxted Dep. Tr. 177:14-19, 181:5-16; Ex. 44, Schechter Dep. Tr. 169:19-170:11, 255:4-9; *see also* Ex. 39, 30(b)(6) Dep. Tr. 297:5-22. In *Kueppers*, for example, the court

reasoned that the plaintiffs' data was "found in possession of (*and thus transmitted to*)" the relevant third-party recipients. 2026 WL 2436413, at *5 (emphasis added).

**D. Elsevier Relies on Common Consent Materials**

"[C]onsent is a statutory exception within 18 U.S.C. § 2710(b)(2) and . . . the burden is on Elsevier to show that its Privacy Policy put Plaintiffs on notice" their personally identifiable information would be disclosed to third parties. Dkt. No. 54, Elsevier Opp. to Pl. Mot. to Strike at 5 (citing *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 867 (9th Cir. 2022) ("[T]he onus must be on website owners to put users on notice of the terms to which they wish to bind consumers.")). Elsevier has consistently identified a limited set of materials as the basis for its consent defense. Exs. 18-19 (Interrogatory Responses Nos. 7, 13); Ex. 39, 30(b)(6) Dep. Tr. 333:11-334:15, 335:7-19, 327:12-329:13, 336:10-24; Ex. 36, Feldstein Dep. Tr. 29:18-30:11, 60:22-61:2, 71:11-25, 74:7-12, 92:21-93:1; Ex. 35, Leddy Dep. Tr. 75:3-10, 177:4-8. During its corporate deposition, however, Elsevier narrowed its consent defense to just the Privacy Policy and Cookie Notice. Ex. 39, 30(b)(6) Dep. Tr. 333:11-334:15; *see also id.* at 335:7-19, 336:10-24. Mr. Feldstein also testified the relevant consent mechanisms remained "fairly stable." Ex. 36, Feldstein Dep. Tr. 112:10-113:1; *see also id.* 64:5-10. Their legal effect is a common question.

The testimony, however, supplies common evidence those materials did *not* provide VPPA-compliant consent. Elsevier testified that its disclosures did not specifically mention sharing video-viewing information with Intercom or Meta, did not name Pendo or Pinterest, provided no mechanism for users to withdraw consent once given, and contained no time limit. Ex. 39, 30(b)(6) Dep. Tr. 263:15-264:15, 265:19-266:13, 269:7-270:10, 320:6-19. It also testified that because it considered Pendo "essential," Pendo was not disabled by the OneTrust consent mechanism Osmosis used. *See id.* 258:12-259:18. Osmosis's Engineering Manager, Brooke Leddy, had previously testified that, to determine whether Elsevier's Privacy Policy "discloses the sharing of video-viewing information," she "would have to reread the policy to see if it specifically uses the word 'video.'" Ex. 35, Leddy Dep. Tr. at 75:23-76:7. It does not. *See* Dkt. Nos. 40-3 & 40-4. And Mr. Feldstein testified Elsevier did not disclose sharing video information, did not use a standalone consent form specific to video, did not seek consent when a user requested or obtained a video, and did not provide a cookie-management category or withdrawal mechanism directed to video information. Ex. 36, Feldstein Dep. Tr. 49:7-14, 57:24-58:9, 61:15-20, 64:11-19, 69:18-70:4, 73:10-18, 88:14-92:3, 105:25-106:6, 117:12-19.

## IV. LEGAL STANDARD

A plaintiff seeking class certification "must affirmatively demonstrate compliance" with Rule 23, *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)), by a preponderance of the evidence, *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022). Rule 23(a) requires numerosity, commonality, typicality, and adequacy. And a Rule 23(b)(3) class requires that common questions predominate and that a class action be superior to other available resolution methods. *Civil Rights Educ. & Enforcement Ctr. v. Hosp. Props. Tr.*, 867 F.3d 1093, 1103 (9th Cir. 2017); *Fitzhenry-Russell v. Dr Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 606-607 (N.D. Cal. 2018) (Cousins, J.).

## V. ARGUMENT

### A. THE REQUIREMENTS OF RULE 23(a) ARE SATISFIED

#### 1. Numerosity

Rule 23(a) requires a class "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[D]istrict courts generally hold . . . that the numerosity requirement is usually satisfied where the class comprises 40 or more members, and generally not satisfied when the class comprises 21 or fewer members." *J.L. v. Cissna*, 2019 WL 415579, at *8 (N.D. Cal. Feb. 1, 2019) (quotation omitted).

Elsevier's testimony and records demonstrate the enormous scale of the registered Osmosis user population. Ex. 39, 30(b)(6) Dep. Tr. 250:18-252:15; Ex. 37, Nxusani Dep. Tr. 127:3-22, 129:10-131:14, 167:8-21; *see also* Fitzgerald Decl. ¶ 14 & Ex. 12. The evidence shows Elsevier's Intercom, Meta, Pinterest, and Pendo configurations operated across the Osmosis platform for all users—not just Plaintiffs—over a period of years. Ex. 39, 30(b)(6) Dep. Tr. 160:20-161:13, 167:6-168:7, 169:9-170:8, 170:20-172:8, 282:4-283:2; Ex. 37, Nxusani Dep. Tr. 124:1-20, 144:6-20, 146:1-22, 165:7-166:12; Ex. 44, Schechter Dep. Tr. 203:23-204:5, 207:21-208:12; Schechter Report ¶¶ 14, 75-87, 115-32; Frankovitz Report ¶¶ 25-33, 83-93. The United States accounts for the largest share of Osmosis users of any single country. Ex. 39, 30(b)(6) Dep. Tr. 137:3-11, 138:16-23, 253:1-4. Elsevier has reported that [redacted]. *Id.* 79:8-13, 80:15-81:18, 85:21-86:4. Elsevier designed Intercom and Pendo to maintain user profiles for essentially the entire registered Osmosis population. Its Intercom sync [redacted]

[redacted] and already contained approximately [redacted] Osmosis user profiles by July 2023. *See* Ex. 39, 30(b)(6) Dep. Tr. 248:12-252:15, 255:4-16, 298:15-299:11; Ex. 37, Nxusani Dep. Tr. 127:3-22.

Elsevier provided Intercom with data regarding Osmosis users [redacted]. Ex. 39, 30(b)(6) Dep. Tr. 187:8-188:4; Ex. 37, Nxusani Dep. Tr. 94:9-20, 95:14-20; Ex. 43, Shaxted Dep. Tr. 61:11-17, 195:20-196:21, 197:13-199:14. Thus, absent a technical failure, registered users who visited Osmosis Learn pages would have [redacted]. The Intercom Subclass therefore likely exceeds the [redacted] who watched a video during the Class Period.

Elsevier similarly designed Pendo to [redacted]. Ex. 39, 30(b)(6) Dep. Tr. 157:6-158:4, 248:12-249:24, 250:18-252:15, 246:16-20, 248:4-11, 255:4-16, 253:5-18; Ex. 37, Nxusani Dep. Tr. 124:21-125:9, 127:3-22, 128:14-24, 132:13-133:4; Ex. 11 (Elsevier describing Pendo as "[redacted]" and "[redacted]," making it "[redacted]").

This included a recurring, approximately [redacted] through which Elsevier [redacted]. *See* Ex. 39, 30(b)(6) Dep. Tr. 249:8-24, 255:4-16, 256:3-13; Ex. 37, Nxusani Dep. Tr. 127:3-17; Schechter Decl. ¶¶ 16-24. And a work ticket instructs, [redacted]. Fitzgerald Decl. ¶ 11 & Ex. 9, row 264; *see also id.*, row 464 (Elsevier consulting Pendo to [redacted]).

Meta is presently obtaining a "sample" of Subclass Member data comprising up to 15,000 rows. Fitzgerald Decl. ¶ 34; *see also* Ex. 44, Schechter Dep. Tr. 83:1-10 (blocking of information to Meta by individual users' settings represents "a very small percent of web traffic"). And Pinterest, like Meta's Facebook and Instagram platforms, is a popular social media site with millions of U.S. members. The Pinterest Subclass thus likewise comfortably satisfies numerosity. Elsevier configured its [redacted]

[redacted], and [redacted]. Schechter Report ¶¶ 130-32. Pinterest has thus far searched only for the two named Plaintiffs, and it found [redacted]. Schechter Decl. ¶¶ 12-13; Fitzgerald Decl. ¶¶ 35-39 & Exs. 29-32. Elsevier conceded those records show [redacted]. Ex. 39, 30(b)(6) Dep. Tr. 306:2-308:16. Elsevier also implemented Pinterest [redacted] *Id.* at 238:13-241:20. Against a population exceeding [redacted], the inference that qualifying Pinterest records exist for substantially more than 40 users—and that joinder is, in all events, impracticable—is "common sense." *See Jancik*, 2025 WL 560705, at *6.

**2. Commonality**

Rule 23(a)(2) requires there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This means the existence of a contention whose truth or falsity resolves an issue central to every Class Member's claim "in one stroke." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (quoting *Wal-Mart*, 564 U.S. at 350). But the rule "only requires a single significant question of law or fact." *Id.* at 589. Here, significant common questions include: (i) whether Elsevier or Osmosis delivers prerecorded audiovisual materials; (ii) whether registered Osmosis users are VPPA consumers; (iii) whether Osmosis Learn-page URLs or page titles identify specific video materials or services; (iv) whether the identifier each third-party recipient collected (e.g., name, email, unique ID), together with a Learn-page URL or page title, is VPPA PII; (v) whether Elsevier knowingly installed and configured the relevant code and trackers; (vi) whether the common Osmosis registration and policies provided informed written consent satisfying each requirement of 18 U.S.C. § 2710(b)(2)(B); and (vii) whether Elsevier's use of any third-party technology is an "ordinary business use" under 18 U.S.C. § 2710(b)(2)(E). *See Kueppers*, 2026 WL 2436413, at *5; *Jancik*, 2025 WL 560705, at *7; *Carbone v. Ltd. Run Games, Inc.*, 2025 WL 3254618, at *8 (E.D.N.Y. Nov. 21, 2025) (considering motion for preliminary approval).

**3. Typicality**

Typicality is satisfied if the class representatives' claims are "reasonably co-extensive with those of absent class members," even if they are "not . . . substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998); *see also* Fed. R. Civ. P. 23(a)(3). Here, Plaintiffs used the same Osmosis platform,

registered through channels used by other Class Members, requested and obtained videos through the same Learn (and perhaps Video) pages, and were subject to the same tracking code and consent materials. *See* Ex. 39, 30(b)(6) Dep. Tr. 288:4-289:24; Ex. 40, Nguyen Dep. Tr. at 37:5-15, 47:5-15, 58:3-17; Ex. 41, Garcia Dep. Tr. 25:16-27:10, 33:7-12, 34:9-35:15, 59:25-60:12; *see also Carbone*, 2025 WL 3254618, at *8.

In addition, Ms. Nguyen's Intercom records contain the same categories of identity and page information that define the Intercom Subclass. Frankovitz Report ¶¶ 83-89; Schechter Report ¶¶ 84-87. Mr. Garcia's Meta records similarly contain the same [redacted] that define the Meta Subclass. Frankovitz Report ¶¶ 90-93; Schechter Report ¶¶ 125-29. Both Plaintiffs' Pinterest records include their [redacted] that define the Pinterest Subclass. Ex. 39, 30(b)(6) Dep. Tr. 306:2-308:16; Fitzgerald Decl. ¶¶ 35-39 & Exs. 29-32. And both Plaintiffs' Pendo records associate their [redacted]. Ex. 39, 30(b)(6) Dep. Tr. 256:3-18, 258:3-11, 309:6-310:15; Ex. 37, Nxusani Dep. Tr. 154:19-22, 161:6-163:24; Schechter Decl. ¶¶ 18-23; Fitzgerald Decl. ¶¶ 40-42 & Exs. 33-34. *Cf. Kueppers*, 2026 WL 2436413, at *2, *9 (certifying Meta, Pinterest, and MNTN subclasses where plaintiffs' data was in their possession).

Finally, Plaintiffs' claims turn on the same legal theories and common evidence as the Subclasses they seek to represent. Differences in the number of records or videos do not make their claims atypical because one qualifying disclosure establishes Class membership and the liability theory is the same across the Class, and for each disclosure.

**4. Adequacy**

Rule 23(a)(4) adequacy requires that the Class Representatives have no conflicts with the Class and that they and their counsel will prosecute the action vigorously. *See Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (citing *Hanlon*, 150 F.3d at 1020); Fed. R. Civ. P. 23(a)(4). Here, Ms. Nguyen and Mr. Garcia seek the same relief as other Class Members, based on the same defendant practices, have no antagonistic interests, understand their duties, and have been vigorously pursuing the Class's claims. *See* Nguyen Decl. ¶¶ 1-5; Garcia Decl. ¶¶ 1-5. Ms. Nguyen, for example, testified that although the Court-ordered forensic imaging of her devices made her consider abandoning the litigation because she regarded it as invasive, she submitted to the imaging and continued representing the Class because she "believe[s] this suit is for a good cause" and wants "to continue to act as a class rep for other class members." Ex. 40, Nguyen Dep. Tr. at

165:3-8, 168:3-15; *see also id.* at 165:13-20, 166:4-16 (describing imaging process); *see also* Ex. 41, Garcia Dep. Tr. at 38:11-39:14, 76:20-77:4, 193:5-23.

And proposed Class Counsel, Fitzgerald Monroe Flynn PC ("FMF"), has investigated and prosecuted this case since January 2025, serving multiple rounds of written party and third-party discovery, reviewing Elsevier's technical productions, taking the depositions of Elsevier and various Osmosis engineering, product, and marketing witnesses, and retaining technical experts. Fitzgerald Decl. ¶¶ 53-63. FMF focuses its practice on class actions and has committed the resources necessary to continue this litigation. *See id.* ¶ 53 & Ex. 45 (Firm Biography). Rule 23(a)(4) and 23(g) are satisfied.

## B. THE REQUIREMENTS OF RULE 23(b)(3) ARE SATISFIED

### 1. Common Questions Predominate

Rule 23(b)(3) predominance asks whether the proposed Class is "sufficiently cohesive to warrant adjudication by representation." *Hanlon*, 150 F.3d at 1022 (quotation omitted). The inquiry follows the "elements of the underlying cause of action." *See Olean*, 31 F.4th at 665 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)). Here, the VPPA prohibits a video tape service provider from knowingly disclosing personally identifiable information concerning a consumer unless an enumerated exception applies. 18 U.S.C. § 2710(a)(1), (a)(3)-(4), (b)(1)-(2). Each element is resolvable by common proof, with the Class definition removing any transmission-specific inquiry by requiring an actual qualifying third-party recipient record. *See Kueppers*, 2026 WL 2436413, at *9; *Jancik*, 2025 WL 560705, at *9; *Carbone*, 2025 WL 3254618, at *10. Indeed, just weeks ago, one federal court held that VPPA cases based on systemic transmission of personally identifiable information through tracking technologies to third parties are "tailor made" for class certification because "the disclosure occurs systematically and without consent, while plaintiffs play a relatively small role, if any . . . ." *See Kueppers*, 2026 WL 2436413, at *7.

#### a. Consumer Status is Common

The VPPA defines a consumer as a "renter, purchaser, or subscriber" of goods or services from a video tape service provider. 18 U.S.C. § 2710(a)(1). The inquiry depends on whether the person has a commitment, relationship, or association with the provider, considering registration, delivery, access to restricted content, payment, and expressed association. *See Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 718 (N.D. Cal. 2023) (quoting *Ellis v. Cartoon Network Inc.*, 803 F.3d 1251, 1256 (11th Cir. 2015)).

Payment is not required where registration and restricted access establish the relationship. *Ballard v. Insomniac Holdings, LLC*, 2025 WL 1696558, at *4 (N.D. Cal. June 17, 2025).

Here, every Class Member necessarily registered for Osmosis, supplying identity information, establishing an account, and obtaining full-library video access unavailable to unregistered visitors. Ex. 39, 30(b)(6) Dep. Tr. 27:9-28:8, 30:1-10, 31:2-25, 68:10-69:10; Ex. 36, Feldstein Dep. Tr. 27:22-28:7, 29:18-30:6, 30:20-31:7, 42:9-21, 95:12-25; *see also id.* 28:22-29:17. That common relationship existed whether the user paid directly, signed up for a free trial, or enrolled through an institution. Ex. 39, 30(b)(6) Dep. Tr. 27:16-20, 31:2-25; *see also* Ex. 36, Feldstein Dep. Tr. 29:18-30:6, 30:20-31:7, 42:9-21.

To the extent differences that matter emerge, the Plaintiffs cover the gamut. Ms. Nguyen, fitting Elsevier's description of the B2C channel, personally created her Osmosis account, initially used a free trial, then purchased and personally paid for a subscription. Ex. 40, Nguyen Dep. Tr. 47:5-15, 58:13-17, 75:7-15; Nguyen Decl. ¶ 2; Exs. 20-21 (dashboard); *see also generally* Ex. 39, 30(b)(6) Dep. Tr. 31:2-25, 122:15-23 (explaining Osmosis's "B2C" and "B2B" user channels). Mr. Garcia's institutional access is typical of the "B2B" channel because he registered personally, supplied identifying information, activated his account, and obtained ongoing access under his school's subscription, paid for through his tuition. Ex. 41, Garcia Dep. Tr. 26:3-27:10, 30:17-31:7, 63:1-10, 118:1-119:7; Garcia Decl. ¶ 2; Exs. 22-23 (dashboard); *see also* Ex. 39, 30(b)(6) Dep. Tr. 31:2-25, 122:15-20. Consumer status can thus be determined from common account and access records.

**b. Elsevier is a "Video Tape Service Provider"**

A video tape service provider is one "engaged in the business of the rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials," 18 U.S.C. § 2710(a)(4). This Court previously held Plaintiffs plausibly alleged this because Osmosis includes a vast prerecorded-video library and Osmosis is one of Elsevier's product offerings. *Nguyen*, 2025 WL 1635679, at *2-3. The evidence has borne that out. Elsevier testified that it owns and operates Osmosis, that individual users receive access to prerecorded videos, and that Osmosis maintained 3,000 to 4,000 prerecorded videos during the Class Period. Ex. 39, 30(b)(6) Dep. Tr. 22:24-23:9, 27:12-20, 30:16-32:7; Ex. 44, Schechter Dep. Tr. 100:15-101:21, 131:9-133:4; *see also* Ex. 10 (Elsevier employee identifying "a catalogue of over 3000 videos" on Osmosis in January 2023). And Ms. Leddy previously testified that through Osmosis, Elsevier delivers audiovisual

content, and that doing so is part of its business model. Ex. 35, Leddy Dep. Tr. 31:9-15; *see also* Ex. 36, Feldstein Dep. Tr. 119:13-120:7 (Osmosis "offer[s] video access as part of [its] subscription," its video services are part of Elsevier's business, and Elsevier "offer[s] access to videos that Osmosis has created"); Ex. 40, Nguyen Dep. Tr. 82:14-17 ("My understanding is that . . . the primary product of Osmosis is the video").

The Ninth Circuit's decision in *Osheske v. Silver Cinemas Acquisition Co.*, 132 F.4th 1110 (9th Cir. 2025), further demonstrates why Elsevier is a video tape service provider. In *Osheske*, the Ninth Circuit held that a theater does not deliver audiovisual materials by selling access to a shared, synchronous screening, especially since patrons do not control the ability to pause, rewind, stop, and resume the video material. *Id.* at 1113-14. Osmosis is the opposite. Registered users obtain individualized access to specific prerecorded videos, may start and pause playback, and can return later to resume from their recorded progress point. Ex. 39, 30(b)(6) Dep. Tr. 59:20-60:19, 61:17-62:13, 115:1-116:14; Ex. 35, Leddy Dep. Tr. 105:4-106:7. Whether those common features constitute the delivery of audiovisual materials is a single merits question for the Class.

**c. Qualifying Records Contain Personally Identifiable Information**

In the Ninth Circuit, personally identifying information under the VPPA is that which "would readily permit an ordinary person to identify a specific individual's video-watching behavior." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) (quotation omitted). Here, the proposed Class requires a third-party recipient record connecting an identifier objectively linked to the Class Member or their account, with a URL or title identifying a specific Osmosis video.

The Intercom proof that Plaintiffs adduced is direct and includes [redacted] in the same record set. Ex. 43, Shaxted Dep. Tr. 197:20-199:14; Ex. 39, 30(b)(6) Dep. Tr. 292:11-293:16, 297:5-22, 298:7-10; Ex. 42, Frankovitz Dep. Tr. 47:11-23, 49:23-50:17, 53:24-55:17; Ex. 37, Nxusani Dep. Tr. 94:12-20, 95:14-16, 101:5-12, 115:16-20; Fitzgerald Decl. ¶¶ 28-32 & Exs. 24-26; Frankovitz Report ¶¶ 83-89; Schechter Report ¶¶ 85-87. The Meta records contain Mr. Garcia's identifying [redacted]. Ex. 39, 30(b)(6) Dep. Tr. 301:4-302:7, 302:20-304:6; Ex. 43, Shaxted Dep. Tr. 102:21-24, 134:21-135:9, 136:3-137:6, 173:14-22. Ex. 27; Frankovitz Report ¶¶ 90-93; Schechter Report ¶¶ 125-29. The Pinterest records associate a [redacted]

[redacted]. Fitzgerald Decl. ¶¶ 35-39 & Exs. 29-32; Schechter Decl. ¶¶ 12-13. And the Pendo Subclass likewise contains significant identifying data including not only [redacted]. Ex. 37, Nxusani Dep. Tr. 154:19-22, 161:6-162:7, 164:13-166:10; Ex. 39, 30(b)(6) Dep. Tr. 255:4-256:13, 258:3-11, 310:2-22; Fitzgerald Decl. ¶¶ 40-42 & Exs. 33-35; Schechter Decl. ¶¶ 18-24.

Courts have treated direct identifiers, hashed emails, account identifiers, and similar information linked to a specific video as sufficient at the pleading or merits stage. *See Edwards v. MUBI, Inc.*, 773 F. Supp. 3d 868, 879 (N.D. Cal. 2025); *Balestrieri v. SportsEdTV, Inc.*, 2025 WL 2776356, at *9 (N.D. Cal. Sept. 16, 2025); *Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 160 (S.D.N.Y. 2023). Whether the defined fields satisfy *Eichenberger* is a common issue within each Subclass.

**d. Knowledge is Shown Through Common Corporate Evidence**

A video tape service provider is liable under the VPPA if it "knowingly discloses" personally identifiable information. 18 U.S.C. § 2710(b)(1). The "knowingly discloses" standard is unsettled. *See Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1067 (9th Cir. 2015) (declining to "address whether Plaintiffs adequately alleged a 'knowing' disclosure"). That legal question is itself common to the Class.

The most demanding formulation in this Circuit, however, holds that "knowingly" requires "consciousness of transmitting the private information," not merely knowing code was being transmitted. *In re Hulu Privacy Litig.*, 86 F. Supp. 3d 1090, 1095-97 (N.D. Cal. 2015) ["*In re Hulu*"]. This means "the defendant must have knowingly disclosed 1) a consumer's identity; 2) the identity of specific video materials; and 3) the fact that the identified person requested or obtained that material." *Nguyen*, 2025 WL 1635679, at *3 (citation modified) (quoting *In re Hulu*, 86 F. Supp. 3d at 1095); *but see Cole v. LinkedIn Corp.*, 807 F. Supp. 3d 959, 969 (N.D. Cal. 2025) (an "allegation that [defendant] knowingly installed the Pixel and configured it in a manner resulting in the conveyance of [plaintiff's] personally identifiable information to third parties sufficiently pleads that [defendant] knowingly disclosed her personally identifiable information"). The Court need not choose between formulations now because Plaintiffs' common proof satisfies the most demanding *Hulu* standard.

This is not a case in which Plaintiffs argue knowledge must be inferred merely because third-party code happened to be present on the website. Instead, Elsevier and its agents affirmatively installed and

configured the technologies, selected their triggers and variables, populated identifying fields, tested their operation, and repeatedly investigated what information they transmitted. Elsevier's expert agreed the relevant technologies "don't install themselves," that Elsevier configured them and selected the Google Tag Manager triggers and variables, and that configuration changes require affirmative action. Ex. 43, Shaxted Dep. Tr. 220:17-221:12. And Elsevier understood what the video-related half of the disclosure conveyed. It testified that an Osmosis URL could be used to locate the corresponding Learn page and, in appropriate cases, determine the associated video. Ex. 39, 30(b)(6) Dep. Tr. 95:1-96:3; *see also id.* 38:1-11, 47:15-23, 51:13-52:5. The recipient-specific evidence then shows Elsevier deliberately combining such page or video information with information identifying the user.

**Intercom.** Elsevier's engineers expressly programmed Intercom to [redacted]. Ex. 5; Ex. 37, Nxusani Dep. Tr. 101:1-12. Elsevier's Principal Engineer, Ché Nxusani, agreed this [redacted]. Ex. 37, Nxusani Dep. Tr. 115:16-20. Other Elsevier code [redacted]. Exs. 6-8; Ex. 37, Nxusani Dep. Tr. 98:10-17, 110:7-111:12, 112:13-17, 114:19-118:8; *see also* Ex. 43, Shaxted Dep. Tr. 196:4-198:24.

Elsevier's testimony supplies the remainder of the *Hulu* inquiry. Elsevier testified that Osmosis sent Intercom users' [redacted] Ex. 39, 30(b)(6) Dep. Tr. 92:23-94:14. To do so, Elsevier maintained a [redacted]. Fitzgerald Decl. ¶ 11 & Ex. 9 (rows 74, 264). And Intercom's own production confirms the result. Elsevier identified Ms. Nguyen's [redacted]. Ex. 39, 30(b)(6) Dep. Tr. 292:11-293:16, 297:5-22, 298:7-10. Thus, the same corporate evidence permits a factfinder to conclude Elsevier consciously supplied Intercom both an identified Osmosis user and information about the Osmosis page that user accessed.

**Meta.** The Meta evidence is even more direct. Elsevier knew that [redacted]. *Id.* 97:17-98:14. Its engineers deliberately placed persistent user identifiers into the tracking architecture. An April 2023 work ticket instructed them to [redacted]. Ex. 37, Nxusani Dep. Tr. 60:11-63:22; Fitzgerald Decl. ¶ 11 & Ex. 9 (row 403); *see also* Schechter Report ¶¶ 50, 80.

There is also direct evidence Elsevier understood Meta's identity-matching function. In June 2024, its agent, Publicis, advised Elsevier that Meta's [redacted] Ex. 39, 30(b)(6) Dep. Tr. 227:4-23. Elsevier testified it was aware of that functionality and, Ms. Leddy wrote that she could see Osmosis was [redacted] Ex. 39, 30(b)(6) Dep. Tr. 227:15-228:24, 229:19-231:12. She created an [redacted] *Id.* 229:19-230:24. Asked whether that indicated those data fields were in fact being sent, Elsevier agreed, [redacted] *Id.* 233:11-22. Elsevier and Publicis also actively configured and tested Osmosis's [redacted], including [redacted]. Fitzgerald Decl. ¶ 18 & Ex. 16.

Those events followed repeated warnings from Meta. In February 2024, Meta warned that [redacted] Ex. 13. Osmosis's Principal Engineer, Chè Nxusani testified that Elsevier [redacted] Ex. 37, Nxusani Dep. Tr. 173:11-175:10, 176:8-11. He later received the June 2024 correspondence explaining [redacted]. *Id.* 177:9-180:13. Mr. Feldstein likewise testified that Elsevier audited what was being sent through the Meta Pixel, temporarily disabled it while reviewing the issue, and later re-enabled it. Ex. 36, Feldstein Dep. Tr. 127:16-130:14.

Meta's production confirms what these configurations generated. Reviewing Mr. Garcia's records, Elsevier identified Meta's [redacted]

[redacted], and conceded that [redacted] Ex. 39, 30(b)(6) Dep. Tr. 301:4-304:6. Thus, even under *Hulu*, the Meta knowledge inquiry can be decided from common evidence showing that Elsevier understood both the identifying information it configured Meta to match and the page information transmitted with the relevant events.

**Pinterest.** The Pinterest evidence likewise turns on common configuration and testing. Elsevier deployed Pinterest through Google Tag Manager for marketing purposes. Ex. 39, 30(b)(6) Dep. Tr. 236:7-25. Its version history contains a tag expressly named [redacted], and Dr. Schechter's analysis of the configuration explains it transmitted [redacted]. Ex. 39, 30(b)(6) Dep. Tr. 243:3-22; Schechter Report ¶¶ 130-32. Elsevier's records show employees [redacted] Fitzgerald Decl. ¶ 11 & Ex. 9 (row 384).

The record also shows that Elsevier understood Pinterest's identity-matching function. During its later Pinterest implementation, Elsevier was advised that [redacted]. Ex. 39, 30(b)(6) Dep. Tr. 240:1-241:20. Pinterest's production closes the factual loop, containing Plaintiffs' [redacted], and Elsevier agreed that [redacted] *Id.* 306:2-308:16; Fitzgerald Decl. ¶¶ 35-39 & Exs. 29-32; Schechter Decl. ¶¶ 11-15. Whether this uniform configuration, testing, and recipient-side evidence establishes Elsevier's knowledge under *Hulu* is therefore a common question.

**Pendo.** Pendo provides especially direct evidence that Elsevier knowingly associated identified Osmosis users with their page and video activity. Mr. Nxusani was one of the lead engineers [redacted] and involved in engineering discussions [redacted]. Ex. 37, Nxusani Dep. Tr. 124:16-125:9, 127:3-24. Elsevier's work ticket records document testing [redacted] on Learn pages, including an instruction to [redacted] Fitzgerald Decl. ¶ 11 & Ex. 9 (row 170); *see also* Ex. 37, Nxusani Dep. Tr. 154:1-24.

The same engineering record expressly joins that activity to identified users. A work ticket directed that, [redacted]

[redacted] and Mr. Nxusani acknowledged that, at a high level, the ticket called for Osmosis to [redacted]. Ex. 37, Nxusani Dep. Tr. 155:21-157:15. Elsevier likewise testified that Pendo s[redacted]. Ex. 39, 30(b)(6) Dep. Tr. 248:12-249:24, 253:5-18, 255:4-256:13.

Most importantly, Pendo's own production shows the two sides of the disclosure together. Mr. Nxusani reviewed a Pendo record containing [redacted]. Ex. 37, Nxusani Dep. Tr. 161:6-163:24. The same Pendo production contained [redacted]. *Id.* 164:13-165:11. Asked whether Elsevier had intentionally configured Osmosis to send Pendo this information so that Pendo could identify the particular Osmosis user, Mr. Nxusani explained that Pendo [redacted] *Id.* 165:12-166:10. Pendo therefore presents direct common proof of the precise association *Hulu* addresses: an identified Osmosis user, specific video information, and an event recording that user's interaction with the video.

At bottom, corporate knowledge in this case can be shown through the common acts and records of Elsevier. This includes evidence of engineers and agents intentionally selecting the technologies, fields, triggers, and events; of employees testing and auditing what those technologies transmitted; of outside recipients and consultants alerting Elsevier to identifying data being transmitted and used for matching; and of the third-party recipients' own records confirming the resulting associations between identified Osmosis users and their page or video activity. Whether that evidence satisfies *Hulu*—or the less demanding formulation applied elsewhere—will produce the same answer for every member of each recipient Subclass. Knowledge therefore presents a predominating common merits question.

**e. Consent is a Common Statutory Defense**

The VPPA permits disclosure with informed written consent only if it is (i) in a form distinct and separate from other legal or financial obligations; (ii) obtained, at the consumer's election, at the time disclosure is sought or in advance for a set period not exceeding two years, or until withdrawn; and (iii) provides a clear opportunity to withdraw case by case or from ongoing disclosures. 18 U.S.C. §

2710(b)(2)(B). As discussed in Section II(D) above, *supra* p. 9, Elsevier relies on limited, standardized registration flows and generalized policy documents for its consent defense. Even assuming each user assented to every document Elsevier cites, whether those common documents satisfy the statute is a classwide legal question.

Elsevier's own records show consent management was implemented through common technical configurations. In August 2024, for example, Publicis advised Elsevier that [redacted] Fitzgerald Decl. ¶ 16 & Ex. 14. When Elsevier's Gavin Barrett asked Mr. Nxusani to investigate, he agreed [redacted] *Id.* Notably, however, Elsevier's own witnesses and discovery responses did not identify a separate video-privacy consent, a video-specific disclosure, a time-of-disclosure election, a two-year consent term, or a case-by-case video withdrawal mechanism. Ex. 39, 30(b)(6) Dep. Tr. 263:1-264:15, 265:8-266:13, 269:7-270:10, 320:6-19, 321:11-16, 333:11-336:24; Ex. 35, Leddy Dep. Tr. 75:3-10, 75:23-76:7; Ex. 36, Feldstein Dep. Tr. 49:7-14, 57:24-58:9, 61:15-20, 69:18-70:4, 72:23-73:8, 88:14-90:1, 90:13-91:7, 105:25-106:6, 107:17-108:6, 117:12-19.

**f. Ordinary Course of Business is a Common Statutory Defense**

If Elsevier seeks to leverage the VPPA's exception for disclosures that are "incident to the ordinary course of business," *see* 18 U.S.C. § 2710(b)(2)(E), that, too, is a common statutory defense focused solely on whether the third-party recipient is assisting in "debt collection activities, order fulfillment, request processing, or transfer of ownership." *See id.* § 2710(a)(2); *Markels v. AARP*, 689 F. Supp. 3d 722, 729 (N.D. Cal. 2023). In this case, the inquiry focuses on Elsevier's intent and behavior in using a relevant third party's services—questions that are common to all related Subclass Members.

Here, Elsevier's expert asserts Osmosis provides personally-identifiable user information to Intercom for customer support purposes, Shaxted Report ¶¶ 84-86, but that assertion is contradicted by Elsevier's Intercom code, which says [redacted] Ex. 6 at Elsevier_00000303, and by a work ticket saying Elsevier [redacted], Ex. 9, row 144; *see also* Ex. 38, Stanley Dep.

Tr. 140:5-21 (Osmosis's marketing team used Intercom to create campaigns). Similarly, while Elsevier may argue its disclosures to Pendo fall within the exception, Ms. Leddy testified "Pendo is a marketing feature," Ex. 35, Leddy Dep. Tr. 119:24-120:4. Elsevier testified it uses Pendo for [redacted] Ex. 39, 30(b)(6) Dep. Tr. 257:1-12; Ex. 43, Shaxted Dep. Tr. 74:23-75:4 (Pendo supports [redacted]); Fitzgerald Decl. ¶ 11 & Ex. 9, row 464; Ex. 11. "[N]o court has found" such analytics use "falls within an exception to the VPPA." *Sutton v. TED Found.*, 2026 WL 207000, at *9 (S.D.N.Y. Jan. 27, 2026) (collecting cases).

These merits questions need not be answered now, of course. For certification, it is sufficient that the defense is common to all relevant Subclass Members and resolvable through common evidence concerning Elsevier's use of the relevant third-party tools.

**g. The Records-Defined Class Avoids Individualized Standing and Transmission Issues**

That browser settings, extensions, network conditions, and similar circumstances can theoretically affect whether a transmission occurs, *see*, *e.g.*, Shaxted Report ¶¶ 99-101, does not defeat predominance because the Class definition does not assume transmission merely from Osmosis's code capability. Instead, it requires a qualifying third-party record. For every Class Member, an administrator will be able to identify the recipient record, the linked person or account, and the qualifying URL or title. *See Jancik*, 2025 WL 560705, at *9. The standing inquiry thus follows the same electronic proof used to establish Class membership itself. *See Healy*, 164 F.4th at 706-708; *cf. Kueppers*, 2026 WL 2436413, at *8 (the "Article III . . . 'injury' crystallized when Plaintiffs lost control over the disclosure").

**h. Statutory Damages are Capable of Classwide Measurement**

At certification, plaintiffs must show "damages are capable of measurement on a classwide basis," in a manner "'consistent with [the] liability case,'" *Comcast Corp.*, 569 U.S. at 34-35 (quotation omitted). The VPPA provides actual damages but not less than $2,500 in liquidated damages, together with other authorized relief. 18 U.S.C. § 2710(c)(2). Plaintiffs' theory is that each Class Member suffered the same statutory injury when Elsevier knowingly disclosed record-linked video information without compliant consent. Statutory damages follow directly from that liability theory and do not require individualized calculations. *See Kueppers*, 2026 WL 2436413, at *7 ("[T]here are no individualized damages issues given that Plaintiffs here

seek the statutorily authorized sum of $2,500 in liquidated damages for each class member."); *Jancik*, 2025 WL 560705, at *9. *Comcast* is thus satisfied. *See Davis v. Lab. Corp. of Am. Holdings*, 2022 WL 22855520, at *8 & n.10 (C.D. Cal. June 13, 2022).

**2. A Class Action is Superior and Manageable**

Rule 23(b)(3) asks whether class treatment is superior considering individual control, other litigation, desirability of litigating in the forum, and manageability. *Hanlon*, 150 F.3d at 1023; *Fitzhenry-Russell*, 326 F.R.D. at 616; Fed. R. Civ. P. 23(b)(3)(A)-(D). Here, class treatment is superior because individual VPPA actions would require adducing technical evidence, subpoenaing third-party recipient records, and eliciting expert analysis, the costs of which would dwarf the statutory recovery. *See Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010); *see also Mason v. Spring EQ, LLC*, 2025 WL 2962567, at *10 (C.D. Cal. Sept. 25, 2025) (finding superiority where class members could "recover $500.00 per text under the statute" given the "'disparity between their litigation costs and what they hope to recover'" (quoting *Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001))); *Davis*, 2022 WL 22855520, at *11 ("[T]he $4,000 statutory damages amount is a minimal sum that would be dwarfed by the cost of litigation on an individual basis." (citation modified)); *Kueppers*, 2026 WL 2436413, at *9; *Jancik*, 2025 WL 560705, at *9; *Carbone*, 2025 WL 3254618, at *11. In addition, there is no other known litigation involving these Osmosis practices. Fitzgerald Decl. ¶ 64. Finally, this forum is appropriate because the action is pending here, Elsevier consented to litigating the VPPA issues before this Court, Dkt. No. 14, and substantial motion practice and discovery has already occurred.

Class administration is also concrete and manageable. An administrator can: (1) obtain Elsevier's registered-user table and learn-page table; (2) obtain the third-party recipient exports for Osmosis events; (3) match the specified identifiers; (4) filter for U.S. residence and qualifying URLs or titles; (5) deduplicate repeated events; and (6) preserve the source rows for notice, challenges, and later standing proof. *See Jancik*, 2025 WL 560705, at *9; *see also Gershzon v. Colgate-Palmolive Co.*, 2026 WL 1916431, at *60 (N.D. Cal. Apr. 13, 2026) (finding superiority where, "with the creation of appropriate subclasses, the litigation will be complex but manageable"). That process is the same objective matching exercise the experts performed for Plaintiffs and Elsevier. Frankovitz Report ¶¶ 83-93; Schechter Report ¶¶ 84-87, 125-29; Shaxted Report ¶¶ 89, 96-97. It does not require mini trials about memory, browser settings, or whether a user subjectively

watched enough of a video. *See* Ex. 39, 30(b)(6) Dep. Tr. 68:10-71:19, 83:1-86:4, 148:19-150:15, 292:11-293:16, 301:4-304:6, 306:2-308:16, 310:2-22; Ex. 43, Shaxted Dep. Tr. 127:25-129:14, 162:2-24, 163:11-165:2, 165:10-166:8, 167:14-20, 168:12-169:15.

### 3. The Court Should Certify the Third-Party Recipient Subclasses

Rule 23(c)(5) permits subclasses that are each treated as a class. Recipient-based Subclasses are appropriate here because each third-party recipient at issue uses different field names and matching systems, while the core VPPA questions remain common. Ms. Nguyen's Intercom and Pinterest records make her an adequate and typical representative of those subclasses. Mr. Garcia's Meta records similarly make him an adequate and typical representative of the Meta Subclass. And both Plaintiffs' Pendo records make them adequate and typical Pendo Subclass representatives. *See Kueppers*, 2026 WL 2436413, at *5-6.

The subclass structure also gives the Court flexibility. If a particular identifier or match type ultimately requires different treatment, the Court can refine that subclass without denying certification to people whose direct records present no such issue. And the subclass definitions are tied to objective records and can be modified before judgment if discovery establishes that a field should be included or excluded.

## VI. CONCLUSION

Because the requirements of Rule 23(a) and 23(b)(3) are met, the Court should grant Plaintiffs' Motion for Class Certification, appoint Plaintiffs Kimsa Nguyen and David Garcia Class Representatives, and appoint their counsel Class Counsel.

Dated: September 4, 2026

Respectfully Submitted,

/s/ Jack Fitzgerald

**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD
*jfitzgerald@fmfpc.com*
MELANIE R. MONROE
*mmonroe@fmpc.com*
TREVOR M. FLYNN
*tflynn@fmfpc.com*
KADEN D. BYRON
*kbyron@fmfpc.com*
ALLISON FERRARO
*aferraro@fmfpc.com*
DANIEL E. SACHS

*dsachs@fmfpc.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741

***Counsel for Plaintiffs***